[No. 22946. Department One. April 13, 1931.]

JOHN G. ZORATTI, *Respondent*, v. WEST COAST FINANCE COMPANY et al., *Respondents*, GOLCONDA LEAD MINES et al., *Appellants.*[1]

*Lund & Dodds*, for appellant Golconda Lead Mines.

*Hamblen & Gilbert* (*Philip S. Brooke*, of counsel), for appellant Fidelity National Bank.

*J. B. Alexander, Bundy & Swale*, and *Frank E. Hammond*, for respondents.

MITCHELL, J.—In the latter part of 1928, the Pulp & Paper Securities Corporation, a corporation, and the West Coast Finance Company, a corporation, were engaged in the brokerage business in Seattle. Both companies occupied the same offices. One D. A. Levy was manager of both corporations, and vice-president and treasurer of the West Coast Finance Company, and one E. O. Fitzpatrick was president of one of the corporations and vice-president of the other.

[1]Reported in 297 Pac. 1078.

John G. Zoratti in October, 1928, borrowed five hundred dollars from the Pulp & Paper Securities Corporation, for which he gave his promissory note, payable on demand, and, as collateral thereto, delivered three certificates, one thousand shares each, of the capital stock of the Golconda Lead Mines. On the back of each certificate delivered there was an instrument as follows:

"For value received, ............ hereby sell, assign and transfer unto ........................ shares of the capital stock represented by the within certificate and do hereby irrevocably constitute and appoint ................................................ attorney to transfer said stock on the books of the within named company with full power of substitution in the premises. Dated ................................, 19.........."

This instrument was signed by Zoratti, whose signature was witnessed by E. O. Fitzpatrick. The three certificates of stock thus endorsed by Zoratti were kept in a safety deposit vault under the control of Levy and Fitzpatrick.

The Golconda Lead Mines is an Idaho corporation operating mining property in that state, and at the date of the transactions involved in this action, the Fidelity National Bank in Spokane was transfer agent with respect to the capital stock of the mining company. It appears that the mining stock involved was listed on the stock exchange in Spokane, of which neither of the Seattle corporations was a member.

About December 15, 1928, Fitzpatrick, acting under the instructions of general manager Levy, took the stock from the safety deposit vault and delivered it to L. F. Pearson & Company, stock brokers in Seattle, for the purpose of sale in the Spokane market. Pearson & Company accordingly sold the stock through stock exchange brokers in Spokane at market prices, to different persons who purchased in good faith.

Upon two of the certificates having been presented, the transfer agent issued, instead thereof, new stock in an equal amount to the several purchasers, while, as to the other certificate of one thousand shares, it appears that, after it was sold on the market but before it was presented to the transfer agent for new stock, Zoratti, though not having paid his five hundred dollar note, became suspicious, upon inquiry, concerning the stock, and, notwithstanding his sale, assignment, and transfer agreement on the back of the certificate of stock, notified the transfer agent that he had not authorized the sale or transfer of the stock.

Thereupon, the bank as transfer agent, refused to cancel the certificate for one thousand shares, and issue new stock instead, until the bank was furnished a bond signed by the Spokane stock broker making the sale and the purchaser of the stock at that sale. It appears that, after the stock was sold in Spokane, the broker making the sale forwarded the proceeds, less the usual broker's commission, to Pearson & Company in Seattle, who, in turn, delivered the money to Mr. Levy or the West Coast Finance Company, upon whose books Zoratti was given credit for the full amount of the sale price of the stock.

The West Coast Finance Company and the Pulp & Paper Securities Company each, on account of insolvency, went into the hands of a receiver about March or April, 1929. Thereafter, and in April, 1929, Zoratti commenced this action against the two Seattle corporations and their receivers, two of the purchasers of the stock, the mining company, and its transfer agent the Fidelity National Bank of Spokane, to recover the value of the three thousand shares of stock. The trial, without a jury, resulted in judgment for the value of all the stock against the mining company and its trans-

fer agent, the bank, from which the mining company and the bank have appealed.

Upon attentively examining the many authorities cited by respective counsel, it appears that it will not be necessary to speak of all of them. Respondent relies principally on *Nagel v. Ham, Yearsley & Ryrie,* 88 Wash. 99, 152 Pac. 520. Indeed, his counsel say that, in view of that decision,

". . . it seems idle to make any extended argument in support of the judgment. That case, it seems to us, is decisive of the present case upon every question presented."

Then the features of that case are discussed by counsel in comparison with the facts in this case, but, in our opinion, the cases are materially different. That case was brought by Nagel to compel the transfer to him upon the books of the corporation of certain shares of its corporate stock. Ryrie, the owner of the stock, had pledged it to Ross to secure the payment of a note in the sum of $880 that he had given to Ross. He had endorsed in blank on the back of the certificate of stock a sale, transfer, and assignment agreement similar to the one in the case at bar. There, the note not being paid when due, Ross gave Ryrie notice that if payment was not made by a stated time he would sell the stock. Ryrie still neglecting to pay the note, Ross notified him that he would sell the certificate of stock at a specified time at Ross' office. No public notice of the sale was given. At the time and place mentioned Nagel purchased the certificate of stock. Prior thereto, Ryrie had made an assignment of the same stock and other property to a third party to pay Ryrie's debts. The trial court ordered the corporation to transfer the stock upon its books to Nagel and, in reversing that judgment, this court said:

"Two questions are here presented: First, did title to the stock pass to the respondent by virtue of a valid sale; and, second, if the sale was invalid, does the respondent, notwithstanding that fact, have the right, by reason of holding the certificate assigned in blank by Ryrie with a power of attorney in blank authorizing the transfer, to have it made."

Upon the first question, it was held that, as no public notice of sale was given, the sale was not made in the manner required by law, and therefore was invalid. The second point was discussed from different angles and authorities were cited, following which the court said:

"Applying these rules to the present case, we think that the sale by the pledgee was invalid because no' public notice was given of such sale, and that the corporation had the right to refuse to transfer the stock upon the books of the company."

That is, Nagel got nothing by the invalid sale, and therefore was not entitled to a transfer of the stock; and further, the court, in speaking of the rights of Ross, pledgee of the stock, before he attempted to sell it at his office, said:

"In this case, we express no opinion upon whether the pledgee of the stock prior to the sale, by virtue of the power of attorney, would have had a right to have the stock transferred to him upon the books of the corporation. We only hold that the purchaser at an invalid sale of the stock, evidenced by such a certificate, has not the right to a transfer."

Thus, it is to be seen that in that case the subject of estoppel and the rights of an innocent purchaser were neither involved nor discussed. Quite different here. Zoratti knew this stock was listed on the stock exchange. He had bought and sold, through different brokers, a considerable quantity of several other kinds of stock on the stock exchanges, and testified that in

making sales of other stocks, "I endorsed the stock in blank just like I did the Golconda stock" and "I knew it was the general practice in buying and selling stock in Seattle to simply endorse it in blank when one wished to sell it." He further testified that he had confidence in the persons with whom he was dealing, else he would not have endorsed and delivered the stock to them.

That happens often, indeed, too frequently, and constitutes the first and eventful step in that line of conduct that works an estoppel in this class of cases against the over-confident in protection of the rights of innocent purchasers. The controlling question involved does not relate to the obligation of the Golconda Lead Mines and the bank, its transfer agent, to Zoratti, but to the rights of *bona fide* purchasers, for value, of the stock, which rights are incapable of protection and enforcement except by issuing to them stock in their names for the old stock they purchased, in obedience to the rule that, as between two innocent persons, he must bear the loss who made the loss possible.

In *Schade v. Western Union Life Insurance Co.,* 125 Wash. 200, 215 Pac. 521, the husband took out life insurance naming his wife as beneficiary. By the terms of the policies, there was reserved to him the right to change the beneficiary. He delivered the policies to his wife as a gift and she accepted them as such, and immediately permitted her husband to take them and keep them in his safe for her. On several occasions thereafter she paid premiums on the policies upon his failing to do so. Finally, for a consideration paid by the bank, he duly assigned and delivered the policies as collateral. The insurance company, upon his request, changed the beneficiary in the policies by naming the bank as beneficiary instead of the insured's wife, and without her knowledge of the

change. Neither the insurance company nor the bank knew that the policies had ever been given by the insured to his wife. The bank paid premiums on the policies, and, upon the death of the insured, the bank collected the insurance, and thereafter, to the extent of the decedent's indebtedness to the bank, a suit arose over the proceeds of the life insurance policies between the widow and the insurance company and the bank. In deciding the case against her, this court said:

"Having seen that the agreement in the policy of reserved power in the insured to change the beneficiary is not contravened by any law or public policy, the appellant by permitting the insured to have possession of the policies, after she claims he gave them to her, has by that conduct, making possible his subsequent transactions with them, placed herself where she cannot be heard to complain. She redelivered to him contracts drawn in such form that he could use them as he saw fit, in a business way with persons who in recent years are presumably quite familiar with such securities. It is a pretty clear case for the application of the rule, too well recognized to require the citation of authorities in support of it, that where one of two equally innocent persons must suffer, that one whose act or neglect made the fraudulent act possible must bear the loss occasioned thereby."

Some of our other cases recognizing the same principle are *Willett v. Central Yakima Ranches Co.*, 126 Wash. 587, 219 Pac. 20; *Long v. McAvoy*, 133 Wash. 472, 233 Pac. 930, 236 Pac. 806; *Kibler v. Yakima Finance Corporation*, 144 Wash. 604, 258 Pac. 490.

The case of *National Safe Deposit Co. v. Hibbs*, 229 U. S. 391, involved the sale of stock on the stock exchange, in which case the rule of comparative innocence was discussed and applied. The stock, endorsed and delivered by the owner as a pledge, was taken by a trusted employee of the pledgee and, in gross breach of his duty, sold through a broker on the stock exchange.

In a suit by the pledgee against the broker for alleged conversion of stock the court said:

"Stock certificates are a peculiar kind of property. Although not negotiable paper, strictly speaking, they are the basis of commercial transactions large and small, and are frequently sold in open market as negotiable securities are. In *Bank v. Lanier*, 11 Wall. 369, 377, 378, this court said:

" 'Stock certificates of all kinds have been constructed in a way to invite the confidence of business men, so that they have become the basis of commercial transactions in all the large cities of the country, and are sold in open market the same as other securities. Although neither in form or character negotiable paper, they approximate to it as nearly as practicable. . . . Whoever in good faith buys the stock, and produces to the corporation the certificates, regularly assigned, with power to transfer, is entitled to have the stock transferred to him.'

"These principles are well known to business men and are constantly acted upon by them. This circumstance should be given due weight in determining the rights of the parties in this case."

And then, more definitely as to where the loss in such cases must fall, the court said:

"Here one of two innocent persons must suffer and the question at last is, Where shall the loss fall? It is undeniable that the broker obtained the stock certificates, containing all the indicia of ownership and possible of ready transfer, from one who had possession with the bank's consent, and who brought the certificates to him, apparently clothed with the full ownership thereof by all the tests usually applied by business men to gain knowledge upon the subject before making a purchase of such property. On the other hand, the bank, for a legitimate purpose, with confidence in one of its own employees, entrusted the certificates to him, with every evidence of title and transferability upon them. The bank's trusted agent, in gross breach of his duty, whether with technical crim-

inality or not is unimportant, took such certificates, thus authenticated with evidence of title, to one who in the ordinary course of business sold them to parties who paid full value for them. In such case we think the principles which underlie equitable estoppel place the loss upon him whose misplaced confidence has made the wrong possible.''

The case of *Citizens' Bank of Shelbyville v. Mutual Trust & Deposit Co.*, 206 Ky. 86, 266 S. W. 875, is to the same effect. The court stated the case as follows:

''McCormack delivered these certificates of stock to Morgan & Co., who were brokers in Louisville. Upon each certificate he signed a writing, transferring it to ........................ and he also at the same time delivered to them a power of attorney to ........................, authorizing such person to transfer the stock to ........................, on the books of the company. These were the usual papers executed where stock was put on the market. The blanks were left so that the purchaser could fill in the blanks, and have the stock transferred to him when it reached the hands of a purchaser who wished to hold the stock. Morgan & Co. fell in debt to the Mutual Trust & Deposit Company of New Albany, Ind., and delivered the shares of stock with accompanying papers to it as collateral security for a debt. They did not pay the debt, and became bankrupt. The trust company then, by appropriate proceedings, sold the stock and purchased it at the sale. The two banks refused to recognize the trust company as a stockholder, and this action was brought to require them to issue the stock to the trust company.''

The relief sought by the plaintiff in that case was granted upon the ground of estoppel, the court citing *National Safe Deposit Co. v. Hibbs,* 229 U. S. 391, and quoting from it on the subject of estoppel as we have hereinabove.

In *Powers v. Pacific Diesel Engine Co.,* 206 Cal. 334, 274 Pac. 512, where the certificate of stock endorsed in blank had been obtained from the owner by fraud,

the same doctrine was recognized in protection of the rights of an innocent purchaser. The case collects a great many authorities upon the subject. And, in discussing the subject generally, the court, among other things, said:

"It is common knowledge that, as between the parties to the transaction the property in shares of stock customarily passes in the ordinary and regular course of trade by delivery of the certificate indorsed in blank by the person to whom the certificate purports on its face to have been issued. [Citing cases.] It is commonly understood that the power of attorney so signed in blank will be filled in with the name of the person to whom the property in the shares will ultimately be transferred on the books of the corporation which issued the certificate." (Citing cases.)

The recent case of *Nolan v. Robertson,* 131 Kan. 333, 291 Pac. 750, discusses the subject clearly. There, the plaintiff was trading shares of stock with Bagley & Co. for another kind of stock. He received no consideration for his stock, which he endorsed in blank in the usual way and delivered to Bagley & Co. Bagley & Co. sold the stock to an innocent purchaser. In disposing of the case the court said:

"The result was, plaintiff clothed Bagley & Co. with all the indicia of title, and, under commercial usage relating to stock transfers, clothed Bagley & Co. with power to invest purchasers from Bagley & Co. with title. If such a purchaser should be a purchaser in good faith, for value, without notice of the fraud, the law protects him, and leaves plaintiff to his remedy against the wrongdoer. The basis of this doctrine is well stated in the case of *National Safe Deposit Co. v. Hibbs,* 229 U. S. 391, 33 S. Ct. 818, 57 L. Ed. 1241. Many authorities in support of the doctrine are collated in the case of *Powers v. Pacific Diesel Engine Co.,* 206 Cal. 334, 274 Pac. 512."

Upon the facts in this case, and the applicable reasoning of the authorities herein cited, and others

therein referred to, the judgment appealed from is reversed, with directions to dismiss the action.

TOLMAN, C. J., HOLCOMB, MAIN, and PARKER, JJ., concur.